UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH BACKUES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CV 1042 DDN |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the Commissioner's final decision denying Sarah Backues' applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed.

## I. Procedural History

Plaintiff Sarah Backues[1] applied for DIB and SSI on October 14, 2010, claiming that she became disabled on May 1, 2007, because of emotional problems, bipolar disorder, dyslexia, spelling and communication issues, interrelationship issues, and anxiety. (Tr. 138-44, 145-53, 194.) On February 23, 2011, the Social Security Administration denied plaintiff's claims for benefits. (Tr. 65-67, 73-77.)[2] Upon plaintiff's request, a hearing was held before an

---

[1] In her complaint, plaintiff identifies herself as Sarah Backues, although the transcript of the administrative hearing and the Notice of Appeals Council Action refer to her as "Sarah Bacues." (*See* Tr. 1, 33.) Throughout the remainder of administrative record, plaintiff's surname is indicated as "Bonebrake," which appears to be her maiden name. In this action, the undersigned refers to plaintiff as she identifies herself in the Complaint.

[2] The administrative record also includes a Notice of Disapproved Claims dated June 25, 2009, which appears to be related to previously filed applications. (Tr. 68-72.) There is no indication

administrative law judge (ALJ) on May 21, 2012, at which plaintiff and a vocational expert testified. (Tr. 33-64.) On June 13, 2012, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform work that exists in significant numbers in the national economy. (Tr. 7-27.) On April 11, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing that the ALJ erred in failing to find that her mental impairments met Listing 12.05(C)'s criteria for mental retardation. Plaintiff also claims that the ALJ erred in his credibility determination by failing to consider consistent evidence of record relating to her mental impairments. Plaintiff requests that the matter be reversed and remanded to the Commissioner for an award of benefits or for further proceedings.

Because the ALJ committed no legal error and substantial evidence on the record as a whole supports his decision, the Commissioner's final decision that plaintiff was not disabled is affirmed.[3]

## II. Testimonial Evidence Before the ALJ

A.    Plaintiff's Testimony

At the hearing on May 21, 2012, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was twenty-nine years of age. Plaintiff stands five-feet, two inches tall and weighs 244 pounds. Plaintiff completed the twelfth grade and received no other training or education. Plaintiff has two children, ages seventeen months and ten years,

---

that the ALJ in this case considered these applications or made a determination whether to reopen them. In the instant case, plaintiff does not raise any challenge to the treatment accorded to these applications.

[3] The undersigned has reviewed the entirety of the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence. However, inasmuch as plaintiff challenges the decision only as it relates to her mental impairments and not as it relates to any physical impairment, the recitation of specific evidence in this Memorandum is limited to only that relating to the issues raised by plaintiff on this appeal.

and rents the upstairs portion of her parents' house.  (Tr. 37-39.)

Plaintiff's Work History Report shows that she worked as a fast food cook, cashier, and prep worker from May 1999 to March 2008.  During this time, and specifically from September to December 2007, plaintiff also worked as a housekeeper at a motel.  From May to July 2008, plaintiff worked as a cook at a convenience store.  Plaintiff worked again as a housekeeper at a motel from October 2009 to September 2010.  (Tr. 228.)  Plaintiff testified that she currently works part-time as a housekeeper at a motel, working two or three days a week for three or four hours a day.  Plaintiff testified that she had been so employed, intermittently, for three or four years. (Tr. 39-40.)

Plaintiff testified that she was currently unable to work because of her longstanding inability to get along with people and because she gets upset with people when they make fun of her.  Plaintiff testified that she never lost a job because of this, but has walked out of a job when someone made fun of her.  Plaintiff testified that her current supervisor and coworkers criticize her for not being fast enough in performing her job.  (Tr. 41-43.)

Plaintiff testified that she has suffered from depression for nine years for which she takes prescribed medication that helps.  She becomes hateful if she does not take her medication. Plaintiff testified that she also has difficulty concentrating and gets distracted, which affects her work on a daily basis.  (Tr. 43-45.)

As to her daily activities, plaintiff testified that she gets up at 6:00 a.m. and gets her daughter ready for school.  Her son wakes up around 7:00 or 8:00 a.m. at which time she feeds him and changes his clothes, and then watches him while he plays.  She cooks, does housework, shops for groceries, and manages her money and has no difficulty with such activities.  Plaintiff testified that she has no difficulty tending to her personal care.  (Tr. 50-52.)  She walks one to two miles every day, likes to go fishing and swimming, and has a driver's license.  (Tr. 38, 52.) Plaintiff testified that she occasionally does yard work with her dad.  Plaintiff testified that she uses a computer and helps her mom with the internet.  She does not visit with friends nor does she belong to any social organizations.  Plaintiff testified that she goes to bed around 8:00 p.m. but does not sleep well during the night.  (Tr. 52-54.)

B.    Testimony of Vocational Expert

Denis Waddell, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.  Mr. Waddell classified plaintiff's past work as a housekeeper as light and unskilled, but medium as performed by plaintiff; and as a fast food worker as light and unskilled.[4]  (Tr. 60.)

The ALJ asked Mr. Waddell to assume an individual of plaintiff's age, education, and work background who could perform the full range of medium work, except that she can only

> occasionally climb ramps and stairs, never climb ladders, ropes or scaffolding, and frequently balance, stoop, occasionally kneel, crouch and crawl, need to avoid concentrated exposure to hazards, such as unprotected heights, moving machinery.  Is able to understand, remember and carry out short and simple instructions and can maintain adequate attendance and sustain the ordinary routine without special supervision, can have occasional interaction with coworkers and supervisors, in a work environment where the individual can work relatively independently, requiring only minimal close teamwork in order to complete tasks and can have no more than incidental interaction with the general public and is able to adapt to usual changes common to a competitive work setting, but change, when necessary, is introduced gradually.

(Tr. 60.)  Mr. Waddell testified that such a person could not perform plaintiff's past work as a fast food worker but could perform other work, such as linen room attendant of which 530 such jobs exist in the State of Missouri and 38,900 nationally; order filler, of which 6,000 such jobs exist in the State of Missouri and 175,000 nationally; and counter supply worker, of which 2,300 such jobs exist in the State of Missouri and 95,000 nationally.  (Tr. 61.)

The ALJ then asked Mr. Waddell to assume the person from the first hypothetical to be limited to light work.  Mr. Waddell testified that such a person could perform work as a price marker, of which 2,050 such jobs exist in the State of Missouri and 92,400 nationally; electrical assembler, of which 2,400 such jobs exist in the State of Missouri and 55,000 nationally; and mail router, of which 2,300 such jobs exist in the State of Missouri and 76,000 nationally.  (Tr. 61-62.)

Mr. Waddell testified that a person missing work an average of three days each month

---

[4] The ALJ did not consider plaintiff's past work as a housekeeper to be past relevant work for purposes of social security.  (Tr. 59-60.)

would be precluded from performing any of the jobs to which he had testified, or any other work. Mr. Waddell also testified that a person consistently off-task an average of twenty percent throughout the workday would be precluded from any employment. (Tr. 62.)

### III. Record Evidence Before the ALJ

A.    <u>School Records</u>

In March 1997, while plaintiff was in the seventh grade, Rolla Public Schools determined to re-evaluate her progress. It was noted that plaintiff was participating in special education classes. Problems were suspected in the areas of intellectual/cognitive/adaptive behavior and academic achievement. (Tr. 312-13.)

Plaintiff was administered the WISC-III in April 1997 from which she received a verbal IQ score of 65, a performance IQ score of 73, and a full scale IQ score of 67. The examiner determined the scores to be valid. Administration of the Vineland Behavior Scale showed plaintiff to be weak in the area of adaptive behavior with plaintiff achieving moderately low scores in the areas of communication and socialization skills, and adequate scores in area of daily living skills. Plaintiff's overall composite was noted to be moderately low. Performance on the Woodcock Johnson Tests of Achievement showed plaintiff to perform at the third grade level in broad reading, written language, and knowledge; and at the fourth grade level in broad math. It was noted that such scores were comparable with plaintiff's classroom performance, but that plaintiff had excellent work and study habits. There were no concerns regarding plaintiff's social growth. Summary of plaintiff's educational background included that plaintiff had been retained in kindergarten and had been placed in classes for the Educable Mentally Handicapped since first grade for all academic classes. Upon consideration of the evaluation, the Rolla School District-Department of Special Education concluded that plaintiff had mild mental retardation. (Tr. 302-10.)

In November 2001, when plaintiff was eighteen years of age and in the twelfth grade, her Individual Educational Plan underwent annual review. It was noted that plaintiff participated in regular classes for math, history, and science and had participated in work study/on the job training. Plaintiff was then currently working part-time at a fast food restaurant. It was noted that plaintiff had obtained her driver's license the previous year and drove to and from work.

Plaintiff was noted to function in the mildly mentally handicapped range academically and to have difficulty with organization, planning, memorizing, and dealing with abstract ideas. Plaintiff was capable of completing tasks in the regular classroom with tutorial help and could do mainstream subjects with the help of resource personnel during testing.  As to her social and emotional skills, it was noted that plaintiff was generally well-behaved, had matured, and had participated in the Special Olympics in the past.  Plaintiff was noted to have good adaptive behavioral skills, including caring for her personal property, self-help skills, basic homemaking skills, cooking, cleaning, and managing a daily schedule.  With respect to her vocational skills, it was noted that plaintiff had experienced successful training and had been employed part-time in fast food and at a daycare facility.  Plaintiff had also completed training at a hospital and was an active client at Vocational Rehabilitation.  Regular classroom accommodations included extended time, defined expectations, giving directions in small and distinct steps, shortened assignments, avoiding penalty for spelling errors, and use of a calculator.  Plaintiff was on target to graduate in May 2002.  (Tr. 290-300.)

Plaintiff's high school classes consisted predominantly of work study and on the job training classes for which plaintiff earned A's and B's.  During her senior year, plaintiff also earned A's in math, a B and C in biology, and C's in world history.  Plaintiff graduated in May 2002 with a 3.04 cumulative grade point average.  (Tr. 288, 316.)


B.    Medical and Other Records

Plaintiff went to the emergency room at Phelps County Regional Medical Center on April 8, 2007, after having experienced a suspected miscarriage.  Plaintiff was noted to have a depressed affect.  Plaintiff's current medications included Celexa, but plaintiff reported having not taken it for a while.  (Tr. 348-49.)

On May 30, 2007, plaintiff sought treatment from Ozarks Health Services for migraine headaches.  Plaintiff was also noted to be experiencing depression.  Medication was prescribed for headache prevention.  (Tr. 322.)

On April 15, 2008, plaintiff's treating general practitioner, Dr. Allen E. Northern, diagnosed plaintiff with depression and prescribed Prozac.  (Tr. 376.)  On September 23, 2008, Dr. Northern prescribed Zoloft.  (Tr. 375.)

Plaintiff underwent a consultative psychological evaluation on March 7, 2009, for determination of Medicaid eligibility. Plaintiff reported to Dr. Thomas J. Spencer that her primary care physician prescribed Zoloft for depression. Plaintiff reported that she constantly cried and felt helpless, hopeless, and worthless. Plaintiff reported that she had periodic thoughts of suicide with three previous attempts and/or gestures. Plaintiff reported having insomnia and restless sleep and that she lacked motivation and energy most days. Plaintiff reported being easily irritated and angered. Plaintiff also reported occasionally hearing voices and seeing things. Mental status examination showed plaintiff to have good eye contact and to be cooperative. Plaintiff's speech was soft and flat. Plaintiff's mood was okay and her affect restricted. Plaintiff's flow of thought was intact and organized, and her insight and judgment were noted to be intact. Difficulties were shown with attention and concentration, fund of information, proverb interpretation, and similarities. Dr. Spencer diagnosed plaintiff with major depressive disorder, severe, with psychotic features; and learning disorder not otherwise specified. Dr. Spencer assigned a Global Assessment of Functioning (GAF) score of 45-50[5] and opined that plaintiff had a mental illness that would interfere with her ability to engage in employment suitable for her age, training, experience, and/or education. Dr. Spencer opined that prognosis would likely improve with appropriate treatment and compliance. (Tr. 367-71.)

At the request of the Missouri Department of Disability Determinations, plaintiff returned to Dr. Spencer on June 19, 2009, for administration of the WISC-III from which she obtained a verbal IQ score of 68, a performance IQ score of 77, and a full scale IQ score of 70. Dr. Spencer noted the full scale IQ score to place plaintiff in the borderline range of intellectual functioning. Upon review of the testing as well as plaintiff's school records, disability reports, and the March 2009 psychological evaluation, Dr. Spencer diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features; and borderline intellectual functioning. Plaintiff was noted not to be taking any prescribed medication. Dr. Spencer assigned a GAF score of 45-50

---

[5] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000) (DSM-IV-TR). A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

and opined that plaintiff retained the ability to understand and remember simple instructions and to engage in and persist with simple tasks, but that she did not appear capable of managing benefits without assistance. Dr. Spencer noted plaintiff to demonstrate moderate impairment in her ability to interact socially and adapt to routine change in the workplace. (Tr. 382-84.)

On June 24, 2009, Dr. Mark Altomari, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form (PRTF) in which he opined that plaintiff's borderline intellectual functioning and depressive disorder resulted in mild limitations in plaintiff's activities of daily living; moderate limitations in plaintiff's abilities to maintain social functioning and to maintain concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. 386-97.)

In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr. Altomari opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions, but was not otherwise limited. In the domain of Sustained Concentration and Persistence, Dr. Altomari opined that plaintiff was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them, but was not otherwise limited. In the domain of Social Interaction, Dr. Altomari opined that plaintiff was moderately limited in her ability to interact appropriately with the general public but was not otherwise limited. Finally, in the domain of Adaptation, Dr. Altomari opined that plaintiff was moderately limited in her abilities to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others, but was not otherwise limited. In summary, Dr. Altomari concluded that plaintiff retained the ability to understand and remember simple instructions, could carry out simple work instructions and maintain adequate work attendance, could interact appropriately with coworkers and supervisors, could adapt to most changes in the workplace, and could make simple work-related decisions. (Tr. 398-400.)

On July 14, 2010, plaintiff visited Dr. Spencer for a consultative psychological examination for purposes of determining Medicaid eligibility. Plaintiff reported having recurrent panic attacks and daily outbursts directed toward her daughter and others. Plaintiff reported feeling hateful most of the time. Plaintiff reported that she generally got along in the workplace.

Plaintiff also reported feeling depressed but denied current thoughts of suicide. Plaintiff reported sometimes feeling helpless and hopeless and that she frequently had crying spells. Plaintiff reported having difficulty focusing and staying on task. Plaintiff reported that she sees shadows and hears voices of relatives who had died. Plaintiff reported that she was not currently taking any medication and had not had any medication in at least a year. It was noted that plaintiff no longer lived with her parents, and she claimed having no trouble living on her own. Plaintiff reported spending her days with her daughter or visiting her mother when not working, and that she also engaged in scrapbooking, watched movies, spent time outside, kept her house fairly clean, and cooked. Mental status examination showed plaintiff's eye contact to be fair and that she had a vague ability to relate. Plaintiff's speech was noted as flat. Plaintiff's mood was normal and her affect bland. Plaintiff's thought content was intact, and her insight and judgment were poor. Difficulties were noted with fund of information and proverb interpretation. Dr. Spencer diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features; panic disorder without agoraphobia; rule out bipolar disorder; and borderline intellectual functioning. Dr. Spencer continued in his opinion that plaintiff had a mental illness that interfered with her ability to engage in full time employment suitable for her age, training, experience, and/or education. A GAF score of 50-55 was assigned.[6] (Tr. 401-05.)

On January 19, 2011, Dr. W. David Myers prescribed Zoloft for plaintiff. (Tr. 601.)

On February 9, 2011, plaintiff underwent a consultative psychological evaluation for the state disability determinations department. Dr. Jonathan D. Rosenboom reviewed Dr. Spencer's July 2010 evaluation for purposes of the exam. Plaintiff was noted to have recently filled a prescription for Zoloft written by her obstetrician/ gynecologist. Plaintiff reported that she angers easily and will yell and hit if someone says the wrong thing. Plaintiff reported that she is dyslexic and cannot spell or read. Plaintiff reported having failed her housekeeping test at work. Plaintiff reported crying every day and feeling worthless. Plaintiff reported a history of having suicidal thoughts and that she was psychiatrically hospitalized about eight years prior. Plaintiff reported that her mental symptoms had recently become more intense, but that taking

---

[6] A GAF score of 51 to 60 indicates moderate symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

psychoactive medication helped. Dr. Rosenboom noted plaintiff's employment history, and plaintiff denied having any problems with the relationships she had with her supervisors. The mental status examination showed plaintiff's mood was dysphoric and her facial expression sad. Dr. Rosenboom noted plaintiff's gross motor behavior to be underproductive and slowed, as well as the content of her spontaneous thought. Plaintiff's vocabulary and grammar showed no deficits or significant problems, and no signs of formal thought disorder were noted. Plaintiff was cooperative throughout the evaluation and was fully oriented. Immediate auditory memory and delayed recall showed no impairment. Dr. Rosenboom noted that plaintiff's concentration and mental control were impaired, however, with plaintiff struggling to complete serial threes backward and to spell her last name backward. Dr. Rosenboom diagnosed plaintiff with major depressive disorder, recurrent, severe with psychotic features; alcohol abuse in early remission; history of panic disorder without agoraphobia; and borderline intellectual functioning. Dr. Rosenboom assigned a GAF score of 45. In conclusion, Dr. Rosenboom opined that plaintiff's ability to understand, remember, and carry out complex instructions was slightly impaired by her mental disorder as shown by her difficulties with concentration and mental control. Dr. Rosenboom further opined that plaintiff's ability to respond appropriately to supervisors, coworkers, and work stressors was markedly impaired by her severe and persistent mood disorder. Dr. Rosenboom opined that plaintiff could manage her finances. (Tr. 466-70.)

In a PRTF completed February 23, 2011, Dr. Barbara Markway, a psychological consultant with disability determinations, opined that plaintiff's borderline intellectual functioning, major depressive disorder, panic disorder, and alcohol abuse in remission caused mild limitations in activities of daily living; moderate activities in maintaining social functioning and in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration. (Tr. 472-83.) In a Mental RFC Assessment completed that same date, Dr. Markway opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions, but was not otherwise limited. In the domain of Sustained Concentration and Persistence, Dr. Markway opined that plaintiff was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods, and work in coordination with or proximity to others without being distracted by them, but was not otherwise limited. In the

domain of Social Interaction, Dr. Markway opined that plaintiff was moderately limited in her abilities to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with peers and coworkers without distracting them or exhibiting behavioral extremes, but was not otherwise limited. Finally, in the domain of Adaptation, Dr. Markway opined that plaintiff was moderately limited in her abilities to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others, but was not otherwise limited.

In summary, Dr. Markway concluded that plaintiff retained the ability to understand, remember, and carry out short and simple instructions; could adapt to most changes in the workplace; and make simple work-related decisions. Given her anticipated moderate difficulty with interacting with supervisors and coworkers, Dr. Markway opined that plaintiff would perform best in a setting where she could work relatively independently with limited social contact. (Tr. 484-86.)

On May 12, 2011, Dr. Myers prescribed Zoloft for plaintiff. (Tr. 600.)

On September 19, 2011, plaintiff returned to Dr. Spencer for a consultative psychological examination in relation to determining Medicaid eligibility. Plaintiff reported being easily distracted, dyslexic, and having difficulty reading. Plaintiff reported that she needed help with household tasks and with finances. Plaintiff reported being depressed for ten years and that she currently took Zoloft, which kept her more stable, but that she currently had crying spells twice a week. Plaintiff reported having one or two anxiety attacks a month. Mental status examination showed plaintiff to be cooperative and to have good eye contact. Plaintiff's speech was within normal limits. Plaintiff's mood was noted to be fair and her affect flat. Plaintiff denied having thoughts of suicide or homicide. Plaintiff's flow of thought was appropriate, with no hallucinations or delusions noted. Plaintiff's insight and judgment were noted to be intact and good. Plaintiff's memory and orientation were within normal limits. Attention and concentration showed plaintiff to have difficulty with backward digits, but was otherwise normal. Difficulties were noted with fund of information and proverb interpretation. Dr. Spencer diagnosed plaintiff with adjustment disorder with mixed anxiety and depression; history of major depressive disorder; rule out postpartum depression; and borderline intellectual functioning. Dr. Spencer assigned a GAF score of 55-60. Dr. Spencer opined that plaintiff had a

mental illness that would interfere with her ability to engage in employment suitable for her age, training, experience, and/or education. (Tr. 499-503.)

On October 19, 2011, Dr. Myers diagnosed plaintiff with depression and prescribed Zoloft. (Tr. 599.)

On April 5, 2012, Dr. Myers completed a Mental Medical Source Statement in which he opined that plaintiff experienced marked restrictions in activities of daily living and in maintaining social functioning. Dr. Myers further opined that plaintiff exhibited deficiencies in concentration, persistence, or pace, which resulted in frequent failure to complete tasks in a timely manner; and had repeated episodes of decompensation. Dr. Myers reported that plaintiff exhibited the following signs and symptoms of her impairments: loss of interest in almost all activities, appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, generalized persistent anxiety, hallucinations or delusions, recurrent severe panic attacks, and recurrent intrusive thoughts of a traumatic experience. Dr. Myers opined that plaintiff had borderline inability to function independently outside her home because of panic attacks. Dr. Myers opined that plaintiff was markedly impaired in her ability to carry out detailed instructions and to maintain attention and concentration for extended periods, but was moderately impaired in all other work-related functions. (Tr. 606-08.)

## IV. The ALJ's Decision

The ALJ found that plaintiff met the insured status requirements of the Social Security Act through March 31, 2014. The ALJ found that she had not engaged in substantial gainful activity since May 1, 2007, the alleged onset date of disability. The ALJ found plaintiff's lumbago, obesity, migraine headaches, borderline intellectual functioning, major depressive disorder, and panic disorder to be severe impairments, but that such impairments, either singly or in combination, did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ also found plaintiff's allegations were less than fully credible. (Tr. 10-16.)

The ALJ found plaintiff to have the RFC to perform light work, except that she can only occasionally climb ramps and stairs; never climb ladders, ropes or scaffolding; frequently balance and stoop, occasionally kneel, crouch, and crawl;

and must avoid concentrated exposure to hazards such as unprotected heights and moving machinery. Furthermore, the claimant is able to understand, remember, and carry out short and simple instructions; can maintain adequate attendance and sustain ordinary routine without special supervision; can have occasional interaction with coworkers and supervisors in a work environment where she can work relatively independently requiring only minimal close teamwork in order to complete tasks; and can have no more than incidental interaction with the general public. The claimant is able to adapt to usual changes common to a competitive work setting, but change, when necessary must be introduced gradually.

(Tr. 16-17.) The ALJ determined that plaintiff was unable to perform any past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined that vocational expert testimony supported a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically, price marker, electrical assembler, and mail router. The ALJ thus found that plaintiff was not disabled since May 1, 2007, through the date of the decision. (Tr. 17-27.)

## V. Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920 (2012); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the

Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the plaintiff's impairments.

6.   The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the

claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall*, 274 F.3d at 1217 (*citing Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ erred at Step 3 of the sequential analysis by failing to find that her mental impairments met Listing 12.05(C) – Mental Retardation.  Specifically, plaintiff argues that the ALJ legally erred by requiring an actual diagnosis of mental retardation in order for plaintiff to meet the Listing, when neither the Listing nor legal precedent require such a diagnosis.  Plaintiff also contends that the ALJ's adverse credibility determination is not supported by substantial evidence inasmuch as he failed to consider the consistency in the record regarding her mental impairments.  For the following reasons, the ALJ committed no legal error, and his decision is supported by substantial evidence on the record as a whole.

A.    Listing 12.05(C) – Mental Retardation

Listing 12.05 states, in relevant part:

Mental retardation:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
. . .

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.05 (2012).  To meet Listing 12.05(C), a claimant's

impairment must satisfy the diagnostic description in the introductory paragraph of Listing 12.05 and the criteria in paragraph (C). 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 (2012); *see also Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) (impairment must satisfy diagnostic description in the introductory paragraph).

In plaintiff Backues' case, the ALJ found plaintiff had valid IQ scores that met the first prong of Listing 12.05(C). The ALJ also found plaintiff had another physical or mental impairment that imposed additional and significant work-related limitations of function, satisfying the second prong of the Listing. The ALJ determined, however, that plaintiff failed to satisfy the diagnostic criteria of mental retardation as set out in the introductory paragraph of 12.05 and thus found that plaintiff's mental impairments did not meet the Listing. (Tr. 16.) For the following reasons, the ALJ did not err in this determination.

To meet the diagnostic criteria of mental retardation as described in Listing 12.05's introductory paragraph, plaintiff must demonstrate that she suffers "deficits in adaptive functioning." *Maresh*, 438 F.3d at 899 (requirements in introductory paragraph are mandatory); *Cheatum v. Astrue*, 388 Fed. Appx. 574, 576 (8th Cir. 2010) (per curiam) (requirements include showing deficits in adaptive functioning); *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (claimant bears burden to establish that she meets Listing criteria). Notably, Listing 12.05 does not expressly define "deficits in adaptive functioning." While the Social Security Administration has cautioned against restricting its definition to one used by professional organizations for diagnostic purposes alone – such as the definition set out in the DSM – it nevertheless allows the use of measurement methods endorsed by such professional organizations to assist the Commissioner in determining whether the necessary elements of mental retardation have been established under the Regulations. *See* 67 Fed. Reg. 20018-01, at *20022, 2002 WL 661740 (SSA Apr. 24, 2002); *see also Maresh*, 438 F.3d at 899 (noting the Commissioner rejected a proposal that the DSM's definition of mental retardation be used for Listing 12.05). Significantly, in order to meet Listing 12.05, a claimant need not be formally diagnosed with "mental retardation." *Maresh*, 438 F.3d at 899.

Here, the ALJ found that plaintiff did not meet the criteria of Listing 12.05(C), noting that plaintiff did "not have a diagnosis of mental retardation, which is an inherent requirement of Listing 12.05." (Tr. 16.) If the ALJ were to have ended his step 3 analysis here, his

determination would have run afoul of *Maresh*'s holding that Listing 12.05 does *not* require a formal diagnosis of mental retardation. However, the ALJ continued in his analysis and determined plaintiff had not established she had significant limitations in adaptive functioning; indeed, he concluded that the record established she had much higher functioning. (Tr. 16.) In making this finding, the ALJ looked to the skill areas set out in the DSM-IV-TR's description of adaptive functioning and examined the evidence of record to determine whether plaintiff showed significant deficits therein.[7] The ALJ's finding that she did not show she suffered from significant deficits in adaptive functioning is supported by substantial evidence on the record as a whole.

Specifically, the ALJ noted that plaintiff had taken a driver's test, passed, obtained her driver's license, and continues to drive. *Cf. Miles v. Barnhart*, 374 F.3d 694, 699 (8th Cir. 2004) (passing driver's license test and driving a car inconsistent with Listing 12.05 criteria). The ALJ also noted that plaintiff had graduated from high school with a 3.04 grade point average; and the record shows plaintiff obtained A, B, and C grades in regular classes during her senior year of high school. Plaintiff was also reported to have good adaptive skills while in high school. *See id.* (attending regular classes in high school and earning B grades inconsistent with Listing 12.05 criteria). The ALJ also noted that plaintiff was able to take care of her personal needs, participate in all activities of daily living, go shopping, clean her home and perform household chores, care for her young children, and use a computer. *See McGee v. Astrue*, 291 Fed. Appx. 783, 787 (8th Cir. 2008) (per curiam) (maintaining a home and raising young children inconsistent with listing level mental retardation). The ALJ also noted that plaintiff had been employed since high school, had engaged in substantial gainful activity as an adult, and had lived independently in the past. *Cf. Miles*, 374 F.3d at 699 (living independently inconsistent with criteria of Listing 12.05). The ALJ found that plaintiff's sustained employment history showed her to consistently be able to leave her home and arrive at work on time, not have excessive

---

[7] According to the DSM-IV-TR, "adaptive functioning" refers to "how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting," DSM-IV-TR at p. 42; and is measured in the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *Id.* at p. 41.

absences, and understand and carry out instructions well enough to maintain her employment positions. *See id.* (significant under 12.05 analysis that claimant had never been terminated from a job for lack of mental ability); *see also Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000) (claimant not disabled by mental impairment where he had worked with cognitive abilities he currently possessed). The ALJ also noted that repeated psychological evaluations resulted in consistent diagnoses of borderline intellectual functioning and not mental retardation. *See Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007) (effective diagnosis of borderline intellectual functioning contrary to finding of mild mental retardation). All of these findings demonstrate that plaintiff's impairments did not result in deficits of adaptive functioning so significant to meet the severity of Listing 12.05.

While plaintiff's valid IQ scores and other impairments squarely place her within the criteria of paragraph (C) of Listing 12.05, the ALJ is nevertheless required to examine the full record to determine whether plaintiff experiences the types of deficits in adaptive functioning necessary to meet the criteria set out in 12.05's introductory paragraph. *Maresh,* 438 F.3d at 899*; cf. Miles*, 374 F.3d at 700. This is precisely what the ALJ did here, and his finding that plaintiff's impairments did not meet this criteria was supported by substantial evidence on the record as a whole.


B.      Credibility Determination

Plaintiff argues that the ALJ erred in finding her subjective complaints not to be credible, arguing specifically that the ALJ failed to consider the consistent evidence of record regarding her mental impairments. For the following reasons, the ALJ did not err in his consideration.

In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue,* 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). While an ALJ need not explicitly discuss each *Polaski* factor in his decision, he nevertheless must acknowledge and consider these factors before discounting a claimant's

subjective complaints. *Wildman v. Astrue*, 596 F.3d 959, 968 (8th Cir. 2010).

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider her subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson v. Barnhart*, 363 F.3d 731, 738-39 (8th Cir. 2004). It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. *Id.* at 738; *see also Cline v. Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991). Where an ALJ explicitly considers the *Polaski* factors but then discredits a claimant's complaints for good reason, the decision should be upheld. *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001). The determination of a claimant's credibility is for the Commissioner, and not the Court, to make. *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005); *Pearsall*, 274 F.3d at 1218.

Here, the ALJ set out numerous inconsistencies in the record upon which he found plaintiff's subjective complaints relating to her mental and cognitive impairments not to be entirely credible. First, the ALJ noted that despite plaintiff's complaints of significant mental illness, she was never treated by a psychiatrist or psychologist nor consistently took psychotropic medication for the condition. *Cf. Jones v. Callahan*, 122 F.3d 1148, 1153 (8th Cir. 1997) (failure to undergo regular treatment by mental health professional or regularly take medication for emotional symptoms inconsistent with severe mental impairment). The ALJ also noted plaintiff's testimony that her medication helped her condition when she took it, and that she only became "hateful" if she did not take it. *See Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) (impairment not disabling if it can be controlled by medication).

The ALJ also noted that plaintiff's subjective complaints of disabling mental and cognitive symptoms were inconsistent with her daily activities of caring for two young children, driving a car, going out daily, shopping in stores one or two times each week, maintaining a home and performing daily household chores, caring for pets, fishing, using a computer, watching television, engaging in hobbies, and spending time with her mother and daughter. *See Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010) (fairly normal daily routine, accomplishing basic household tasks, working on computer, and successful interaction with family members

inconsistent with cognitive and social complaints); *Halverson,* 600 F.3d at 932 (caring for personal needs and grooming, caring for pet, preparing meals, performing household chores, driving a car, running errands, going shopping, and watching television inconsistent with complaints of disabling mental impairment).

In addition, the ALJ noted plaintiff's work history was inconsistent with her subjective complaints that her cognitive and mental impairments rendered her disabled. The ALJ specifically noted that plaintiff had been steadily employed since high school, which demonstrated an ability to consistently leave her home, arrive at work on time, not have excessive absences, and understand and carry out instructions well enough to sustain her employment positions. *See Goff v. Barnhart*, 421 F.3d 785, 792-93 (8th Cir. 2005) (persistent part-time employment during period of alleged disability diminished claimant's credibility). These reasons to discredit plaintiff's subjective complaints are supported by substantial evidence on the record as a whole.

To the extent plaintiff claims that the ALJ failed to acknowledge opinion evidence and evidence from consulting examinations that supported her subjective complaints, a reading of the ALJ's decision shows this claim is without merit. Contrary to plaintiff's assertion, the ALJ thoroughly set out and summarized the opinion and consultative evidence of record, including evidence from Drs. Spencer, Myers, and Rosenboom. (Tr. 19-24.) The ALJ specifically noted their findings demonstrating plaintiff's difficulty with the performance of mental tasks, problems with fund of information, impairments in concentration and mental control, and repeated diagnoses of borderline intellectual functioning. The ALJ also noted, however, that mental status examinations also yielded many normal results, including intact flow of thought, intact insight and judgment, cooperative attitude, and intact memory. (*Id.*) It is the duty of the Commissioner to resolve conflicts in the medical evidence. *Renstrom v. Astrue,* 680 F.3d 1057, 1065 (8th Cir. 2012); *Spradling v. Chater*, 126 F.3d 1072, 1075 (8th Cir. 1997); *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995).

Finally, plaintiff appears to argue that the ALJ's adverse credibility determination was influenced by the discounted weight accorded to these physicians' opinions. However, the ALJ thoroughly discussed his reasons to discount these opinions, and his reasons are supported by substantial evidence on the record as a whole. *See* 20 C.F.R. §§ 404.1527(e)(2)(ii),

416.927(e)(2)(ii) (2012) (ALJ required to explain the weight given to any opinions from treating sources, non-treating sources, and non-examining sources); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2012) (Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion."). With respect to Dr. Spencer's Medicaid eligibility opinions that plaintiff's mental impairments interfered with her ability to engage in employment, the ALJ properly noted that an opinion that a claimant is unable to work involves an issue reserved for the Commissioner and is not the type of opinion the Commissioner must credit. *See Ellis v. Barnhart*, 392 F.3d 988, 994-95 (8th Cir. 2005). The ALJ likewise properly discounted Dr. Myers' opinions as to plaintiff's marked mental limitations for the reasons that they were unsupported and not consistent with other substantial evidence of record, *see Hogan,* 239 F.3d at 961 (limitations in treating physician's assessment "stand alone" and were never mentioned in treatment records nor were supported by any objective testing or reasoning); *Goff*, 421 F.3d at 790-91 (inconsistency with other substantial evidence is, in itself, good reason to discount treating physician's opinion); and because no evidence showed Dr. Myers to be a specialist in psychiatry, *see Brosnahan v. Barnhart*, 336 F.3d 671, 676 (8th Cir. 2003) (ALJ properly discounted physician's opinion based on area outside of physician's expertise).

Finally, the ALJ properly discounted that portion of Dr. Rosenboom's opinion stating that plaintiff was markedly limited in her ability to respond appropriately to others and to work stressors, given substantial evidence of record that plaintiff had been able to sustain employment for a number of years and had never been disciplined for problems getting along with others. *See Goff*, 421 F.3d at 790-91; *see also Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2011) (ALJ not required to adopt opinion evidence in its entirety).

A review of the ALJ's decision shows that, in a manner consistent with and as required by *Polaski*, the ALJ considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from her credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. *Goff,* 421 F.3d at 793; *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005).

## VI.  Conclusion

For the reasons set out above, the Commissioner's decision that plaintiff was not disabled is supported by substantial evidence on the record as a whole.   The Commissioner's final decision is affirmed.

A separate Judgment Order is issued herewith.


_____/S/___David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on April 30, 2014.